UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
06-CV-4272(JMR/FLN)

Willie Campbell            )
                           )
         v.                )          ORDER
                           )
Rock Tenn Company          )


     This matter is before the Court on defendant's motion for
summary judgment.  Defendant's motion is granted.

I.  Background

     The facts are viewed in the light most favorable to plaintiff.

     Defendant, Rock Tenn Company ("Rock Tenn"), manufactures paper
products.  Plaintiff, Willie Campbell, is an African-American
lesbian woman who operates a "Michigan" machine at defendant's St.
Paul, Minnesota, plant.  Most of Rock Tenn's St. Paul employees are
white males.  Plaintiff claims she has experienced discrimination
and harassment at work based on her race and sex.  Notwithstanding
this lawsuit, she remains employed at Rock Tenn.  All parties agree
the company considers her a good employee.

     Plaintiff began work at Rock Tenn in February, 2000.  Sometime
during 2001, Chris Gustafson, a co-worker, called her a lesbian.
Plaintiff's Answers to Interrogatories ["Pl. Ans."] at 2.  The
comment upset her.  She felt her sexual orientation was "no one's
business."  Deposition of Willie Campbell, October 26, 2007
["Campbell Dep. 2"] at 12.  She then used Rock Tenn's sexual
harassment policy to report the comment to her supervisor, Chris
Jorgenson.  Deposition of Willie Campbell, October 16, 2007

["Campbell Dep. 1"] at 80; Pl. Ans. at 2.

In April, 2001, plaintiff was in the break room with Randy Johnson and Max Gambradt, two white male co-workers.  She told them she had just purchased a house in Como Park.  Johnson then called her a "Como homo."  Campbell Dep. 2 at 5-6.  She reported this comment to her supervisor, who investigated the incident.  Since that report, Johnson has never made another comment concerning plaintiff's sexual orientation.  Id. at 8.

In 2002, there were two more incidents.  In March, plaintiff went to tell co-workers Steve Cable and Tony Senske her machine needed fuel.  When she arrived, she found Cable and Senske holding hands.  They winked at each other, and Cable said to her, "You know we are lovers."  Id. at 9.  Plaintiff left the room to get fuel, but never reported the incident to management.  In April, plaintiff was working the night shift.  She encountered Max Gambradt, who stopped her as she walked into the break room.  He said, "You know what we do to gay people," and pantomimed shooting himself in the head with a gun.  Id. at 10.  Plaintiff walked around him and took her break.  She did not report this incident.

In April, 2003, plaintiff was working the evening shift, training to be a DCS Control operator with Randy Johnson.  The phone in the room rang.  Johnson picked it up.  Plaintiff heard Johnson say, "No, Max, I am not going to say that to her."  Johnson then handed plaintiff the phone.  Max Gambradt was on the line.  He told her his wife was in Chicago and had been on the Oprah Winfrey

show.  Plaintiff said that was nice.  He then said he told his wife to "hurry up and come home, because you know how it is.  You don't want to be around all those jigaboos." Id. at 13.  Although upset, plaintiff hoped the situation would improve on its own.  She did not report this incident to management.  Id. at 14-15.

In March, 2004, plaintiff had a seizure at work.  Her complaint does not allege, nor is there any evidence, that the seizure was job related.  In April of that year, plaintiff had surgery to correct the vascular problem which caused the seizure.  Upon returning to work in October, a manager, Don Wilson, approached her and whispered in her ear, "You had to come back because you were hungry, huh?"  Campbell Dep. 1 at 91.  Plaintiff apparently took this to mean Wilson thought she had no money to live on.  She was troubled that a manager made this statement.  Id. at 91-92.

Plaintiff complains of another conversation with Joel Powell, a co-worker.  They spoke in either 2004 or 2005.  Plaintiff asked Powell why she was having a hard time working with some fellow employees.  Powell told her, "Number one, you're black.  Number two, you're a woman.  That's why the guys do not like you." Id. at 20-21, 24.  Plaintiff understood him to be referring to her co-workers.  She never reported this conversation to management.

In March, 2005, plaintiff was eating lunch in the break room with Randy Johnson.  Johnson shared with plaintiff some meatballs his wife had made.  She told him they were delicious.  Joe Cole,

another co-worker, overheard this and said, "I got some balls you can eat." Id. at 74. Plaintiff immediately reported this to her supervisor, Chris Jorgenson, who said he would take care of it. Since that report, Cole has never again made a similar comment.

In June, 2005, there was another incident with co-workers John Bain and Tim Bruley. Id. at 24-25. Bain had trained plaintiff to be a refiner operator in 2002. Plaintiff states she respected him and felt they were on good terms. Typically, Bain would relieve her on the refiner, and they would talk briefly about work. Id. at 26-27. This day, however, when Bain came to relieve plaintiff, he brought Bruley along. As he began to train Bruley on the refiner, Bain said, for no apparent reason, "If I had it my way, I would get rid of all women and minorities." Id. at 10.

Plaintiff reported this comment to Don Wilson, the department manager. Id. at 28; see also Affidavit of Don Wilson ["Wilson Aff."] ¶ 3. She told him she felt uncomfortable. Wilson said Bain was "probably just joking." Campbell Dep. 1 at 28. Wilson spoke to Bain within the hour, telling him to avoid such jokes. Wilson Aff. ¶ 3. The parties dispute whether Bain apologized. Compare Wilson Aff. ¶ 3 and Campbell Dep. 1 at 86. According to plaintiff, Bain still makes racial jokes and comments, but she concedes the more recent comments are not as offensive. In any event, plaintiff has not reported any other incidents concerning Bain to management. Id. at 86-88.

In June, 2005, plaintiff claimed Rick Dvorak, a group leader and acting supervisor, harassed her. She had promised him she would be available to back up a co-worker being trained to qualify as a refiner operator. She acknowledges signing up for overtime, and knew she was expected to work. However, she became sick at the beginning of her shift. She spoke to Dvorak, who let her work elsewhere. Dvorak then followed her and told her to get a radio, which she did. He followed her again, at which point she told him she was sick and needed to go home. Plaintiff felt Dvorak was nitpicking and harassing her. Dvorak called Don Wilson, who arranged for someone else to come in. Dvorak then let plaintiff go home.

Several days later, Sid Tousley, a group leader and supervisor, falsely reported to Wilson that plaintiff had lied about being sick. Wilson called plaintiff into his office and accused her of lying. He told her it had better not happen again, because "he backs his group leaders [Tousley and Dvorak] 100 percent, whether they're right or wrong." Id. at 95-99; see also Pl. Ans. at 8. Wilson did not ask for plaintiff's version of events. Plaintiff felt Wilson was treating her less favorably than her white male co-workers.

Finally, an incident took place on the August 29, 2005, day shift. Plaintiff was operating her machine in the yard, approximately 350 yards from Interstate Highway 94. Wilson Aff. ¶ 5; Campbell Dep. 1 at 34. Break time arrived, and everyone except

plaintiff went inside.  While alone, working in the yard, she heard a male voice speaking on her machine's two-way radio.  The voice said, "If you have a pussy or a vagina [pause] I don't expect you to answer me if you're gay, over and out, Dave."  Campbell Dep. 1 at 35.

Plaintiff states she was "very, very upset" by the radio transmission because she felt it was directed at her because she was the only one in the yard.  Id. at 36.  She did not, however, recognize the speaker.  No co-worker named Dave worked that shift, and plaintiff has testified she knows the voices of all her co-workers.  Id. at 29-31.

Plaintiff reported the incident to Carl Brown, a supervisor, and Sid Tousley.  Brown, Tousley, and Wilson met with her shortly thereafter.  Plaintiff said she did not feel safe working in the yard.  They asked her to work inside the plant and remain available to answer questions as they investigated the incident.  Wilson Aff. ¶ 12.  Plaintiff, however, claims she felt she couldn't safely perform her job, and left work early.  Id. ¶ 13; Campbell Dep. 1 at 41-42, 50.  She returned to work the next day and was written up for leaving work and refusing to participate in the investigation.  Campbell Dep. 1 at 43-44.  She maintained she had a manager's permission to leave.  She then filed union grievances, which were ultimately found to be without merit.  Id. at 41, 44-55.

Regardless of her departure, the investigation continued.  No one else heard the comment.  Wilson Aff. ¶¶ 9-10.  Defendant has

provided evidence showing the company's two-way radios occasionally pick up passing conversations from trucks using Highway 94 or other streets near plaintiff's location.  Wilson Aff. ¶¶ 6-8.  Plaintiff acknowledges having heard outside radio transmissions on the radios in older machines, but denies hearing any in the new machine she used that day.  Campbell Dep. 1 at 30-31.

On August 31, 2005, the day after she returned to work, plaintiff filed a charge of discrimination with the St. Paul Department of Human Rights.  Her charge refers to three 2005 incidents - Bain's joke, Dvorak's nitpicking, and the August 29 two-way radio transmission.  She also claimed the presence of adult magazines in her machine.[1]  On May 11, 2006, the Department issued a finding of probable cause.  Plaintiff's Exhibit 10, at 8.

Plaintiff claims additional incidents occurred after she filed her charge.  In February or March 2006, plaintiff was demoted from Michigan operator to "extra helper."   She initially felt the demotion was due to discrimination.  Defendant responded with evidence that plaintiff was one of several employees - including white males - who, under the company's collective bargaining agreement, were "bumped" to lower positions when a more senior employee transferred into the department.   In October, 2006,

---

[1]Plaintiff claims pornographic magazines were left in her machine from time to time.  It is not clear when this started. Plaintiff says she threw them away without reporting this to management. In March, 2007, she gave them to her supervisor, Ann Davis, who did report it to management.

plaintiff's previous position opened up again.  She was reinstated at slightly higher pay than before.  Affidavit of Jackie Lauzon, ¶ 10.  At her deposition, plaintiff agreed a "bump" probably caused the temporary demotion.  Campbell Dep. 1 at 84-85.

On another occasion, plaintiff felt she was not promoted because she was a minority.  She says she applied once for promotion to group leader, either in 2003 or 2004, id. at 11; or in 2005.  Campbell Dep. 2 at 28.  She claims two white male co-workers, Dale Erickson and Dave Evenson, came into her department and were immediately promoted to group leader.  In one deposition, plaintiff testified Evenson received the promotion she applied for in 2005.  Id. at 29-30.  In another, she testified Evenson became a group leader in 2006, after she filed her discrimination charge. Campbell Dep. 1 at 18.  She also claims Erickson, a manager's son, was groomed for promotion to group leader and supervisor.  Her co-workers told her Erickson had a bad record in his previous department and was transferred to let him start over with a clean record.  Campbell Dep. 1 at 15-20.  Plaintiff admits she is not personally familiar with the employment records or background of either Erickson or Evenson.

On April 4, 2006, plaintiff claims co-worker, Paul Lallas, asked her to punch him in on the time clock.  Pl. Ans. at 3. Punching another employee in or out results in automatic termination.  Id. at 4.  At the time, a group leader was standing near the time clock waiting to see if plaintiff was going to punch

Lallas in. Id. at 3-4. Plaintiff felt this was harassment. Two days later, another incident occurred, when after spending a few minutes in the break room prior to the end of her shift, plaintiff approached the time clock to punch out. Sid Tousley waited for her there, and "holler[ed] in her ear, mocking" her, in front of another co-worker, who laughed. Id. at 4.

On June 1, 2006, Joel Powell relieved plaintiff at the end of her shift. He asked plaintiff to hand him a piece of equipment for the machine, saying, "Give me my prick." Plaintiff let him know the comment made her uncomfortable, but he continued to say it. Pl. Ans. at 4. She never reported these incidents.

Plaintiff filed her complaint on August 29, 2006. Defendant moves for summary judgment.

## II. Analysis

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986). The party opposing summary judgment may not rest upon the allegations in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 248-49.

The Court explicitly finds plaintiff's complaint to be considerably less than a model of clarity. Giving the document a very generous reading, the Court discerns claims under 42 U.S.C. §§

1981 and 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), the Minnesota Constitution, the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01-41 ("MHRA"), as well as state tort claims of negligent supervision, negligent and intentional infliction of emotional distress, and defamation.  The Court finds defendant is entitled to summary judgment on each claim.

A.   Section 1983 and Minnesota Constitution

The complaint claims plaintiff is entitled to recover under both 42 U.S.C. § 1983 and the Minnesota Constitution.  Defendant states, and at oral argument plaintiff's counsel acknowledged, defendant is not a government entity.  As such, it is not acting under color of state law.  Because defendant is a private actor, there can be no claim under § 1983.  Defendant is entitled to summary judgment on count 2.

For the same reason, plaintiff has no valid Minnesota constitutional claims.  Plaintiff acknowledges – as she must – defendant is not a state actor.  "The Minnesota Constitution does not accord affirmative rights to citizens against each other; its provisions are triggered only by state action." State v. Wicklund, 589 N.W.2d 793, 801 (Minn. 1999).  Accordingly, defendant is entitled to summary judgment on this count,[2] as well.

B.   Race and Sex Discrimination

Plaintiff claims her employer discriminated against her based

---

[2]The complaint alleges violations of the Minnesota Constitution in count 5.  The next count, alleging negligence, is also styled count 5.  Compl. at 6.

on her race and sex, in violation of Title VII, the MHRA, and 42 U.S.C. § 1981.  She makes no allegation of discrimination based on sexual orientation,[3] nor does she allege retaliation.

The events to which plaintiff refers occurred between 2001 and 2007.  Not all claims are properly before the Court; some newer ones have not been fully exhausted,[4] while certain older ones may be time-barred.[5]  The Court may consider only those claims that have been properly exhausted.  Patrick v. Henderson, 255 F.3d 914,

_____

[3]Title VII does not address discrimination or harassment based on sexual orientation.  Williamson v. A.G. Edwards and Sons, Inc., 876 F.2d 69, 70 (8th Cir. 1989).  The MHRA does.  See Minn. Stat. § 363A.08, subd. 2 (2006).

[4]Plaintiff, in her complaint and discovery, cites events occurring in 2006 - 2007.  These occurred after filing her administrative charge.  She does not appear to have filed separate charges reflecting the later incidents.  Therefore, she has not exhausted her administrative remedies.  As a result, claims of events occurring after August 31, 2005, are not properly before this Court and must be dismissed.  See Briley v. Carlin, 172 F.3d 567, 571 (8th Cir. 1999); Duncan v. Delta Consol. Indus. Inc., 371 F.3d 1020, 1025 (8th Cir. 2004).  However, where plaintiff presents both exhausted and unexhausted claims, the Court has jurisdiction to consider those which were properly exhausted.  Patrick v. Henderson, 255 F.3d 914, 916 (8th Cir. 2001).

[5]Title VII mandates filing an administrative charge within 300 days of an allegedly discriminatory event. 42 U.S.C. § 2000e-5(e)(1).  For the MHRA, the limitations period is one year.  Minn. Stat. § 363A.28 subd. 3 (2006).  Racial harassment claims under § 1981 are subject to a four year limitations period.  See Jones v. R. R. Donnelly & Sons Co., 541 U.S. 369, 383 (2004); 28 U.S.C. § 1658.  Plaintiff filed her administrative charge August 31, 2005. This may bar some of plaintiff's claims, absent waiver, estoppel or a continuing violation - none of which has been alleged.  As the Court grants summary judgment, it need not resolve limitations questions.  A timely charge is not jurisdictional.  Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1194 (8th Cir. 2006).

916 (8th Cir. 2001).  However, even if the Court considers all the events plaintiff alleges, summary judgment is appropriate.

Plaintiff presents no direct evidence of discrimination by Rock Tenn, itself.  In such cases, each statute she invokes requires application of the McDonnell Douglas burden-shifting analysis at summary judgment.  See Riser v. Target Corp., 458 F.3d 817, 820 & n. 2 (8th Cir. 2006), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Under this familiar analytic, plaintiff first must establish a prima facie case of discrimination.  If she does so, the burden shifts to defendant to provide a legitimate, non-discriminatory reason for its actions.  If defendant does so, the burden shifts back to plaintiff to show defendant's reason was a pretext for discrimination.  Riser, 458 F.3d at 819-20.  Plaintiff claims defendant's failure to promote her to group leader was discriminatory, as was her temporary demotion.

To establish a prima facie case of failure-to-promote discrimination, plaintiff must show (1) she is a member of a protected class; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) similarly situated employees, not members of the protected group, were promoted instead.  Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996).

As an African-American female, plaintiff falls within the

12

statutory protections.  Based upon the discovery, it appears that, at a not-altogether-clear-point during a three year period, plaintiff applied to be a group leader.  Her application was rejected.  Other than this bare-bones allegation, she has failed to offer any evidence either of her qualifications for the position, or of those of the person who got the job.  If that person was Dave Evenson, she acknowledges she knows nothing of his background. Campbell Dep. 2 at 18.  Plaintiff suggests two white males in her department, Evenson and Erickson, received preferential treatment – but proffers no evidence showing they were similarly situated to herself.  Accordingly, she has failed to make a prima facie showing of discrimination on her failure-to-promote theory.

To establish a prima facie case of discrimination based on her 2006 demotion, plaintiff must show (1) she is a member of a protected class; (2) she was meeting the employer's legitimate expectations or was qualified for the position; (3) she experienced an adverse employment action; and (4) some evidence allowing an inference of unlawful discrimination, for example, that similarly situated employees outside the protected class were treated differently.  Id.; see also Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 789 (8th Cir. 2007).

The Court assumes plaintiff can establish a prima facie case. But defendant is still entitled to summary judgment.  Plaintiff's temporary demotion to "extra helper" occurred six months after her

charge.[6]  Defendant has produced a legitimate, nondiscriminatory reason for its action; it swears plaintiff was "bumped" by more senior employees, pursuant to her union's collective bargaining agreement.  Rock Tenn has also shown that three white male employees were bumped at the same time, for the same reason. Plaintiff offers no contrary evidence.

Lacking any evidence suggesting defendant's proffered reason is a pretext for discrimination, plaintiff has failed to produce evidence from which a jury could conclude she suffered intentional discrimination at her employer's hand.  Defendant is entitled to summary judgment on plaintiff's claims of discrimination under Section 1981, Title VII, and the MHRA.[7]

A plaintiff may show a violation of these statutes in the absence of any tangible adverse employment action if there is evidence of a hostile work environment.  Here again, each statute applies a common standard to establish such a claim.  See Ross v.

---

[6]Plaintiff offers no evidence suggesting the demotion was retaliatory.

[7]These correspond to complaint counts 1 (Section 1981) and 4 (MHRA).  Plaintiff's claims under Title VII are referenced in the complaint's introduction, see Compl. ¶ 1, but not identified in a separate count.  Similarly, plaintiff's harassment and hostile work environment allegations also appear in the Introduction and the Facts, see id. ¶¶ 1, 7.  They are also seen in her Section 1983 claim, see id. ¶¶ 22-23.  These allegations are not alluded to in plaintiff's Title VII, MHRA or Section 1981, claims.  The Court, however, has construed plaintiff's sexual and racial harassment claims as if they were properly pleaded under Title VII, the MHRA and Section 1981.

Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002) (Title VII and Section 1981); Hervey v. County of Koochiching, 527 F.3d 711, 719 (8th Cir. 2008) (Title VII and MHRA). A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1194 (8th Cir. 2006) (internal quotation omitted). To establish a prima facie case of hostile work environment, a plaintiff must show (1) she is a member of a protected group; (2) she was subject to unwelcome harassment sufficiently severe or pervasive as to affect a term, condition or privilege of employment; and (3) a causal nexus between the two. See id. at 1194-95.

Only "severe or pervasive" harassment is actionable. Id. at 1195. A court, therefore, must consider the totality of the circumstances, including whether the conduct was "frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance." Brenneman v. Famous Dave's of Am., Inc., 507 F.3d 1139, 1143 (8th Cir. 2007). It is well established that isolated incidents of harassment, unless extremely serious, do not rise to this level. Id.

15

Where the alleged harassers are co-workers, a plaintiff must show her employer "knew or should have known of the harassment and failed to take proper action." Gordon, 469 F.3d at 1195.  If, on the other hand, the harassers are supervisors, the employer is vicariously liable, unless it can establish it "exercised reasonable care to prevent and promptly correct any harassing behavior," and plaintiff "unreasonably failed to take advantage of the preventive or corrective opportunities" it provided.  Id., citing Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 765 (1998). The employer may assert this affirmative defense only where, as here, "no tangible employment action" occurs.  Gordon, id., citing Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998).

Here again, the Court finds plaintiff has failed to establish a prima facie case.  While she undeniably belongs to a protected group, she has failed to establish the remaining elements, and defendant is entitled to the Ellerth-Faragher affirmative defense.

As an initial matter, not all incidents of alleged harassment show a connection to plaintiff's race or gender.  For example, co-worker comments dating from 2001 and 2002 address only plaintiff's sexual orientation.  Other incidents - such as Wilson's remark that plaintiff had to return to work because she was "hungry," Dvorak's nitpicking, Tousley's false report and shouting, and Lallas' request to punch him in - lack any obvious connection to plaintiff's membership in any protected class.

16

Even if the Court were to assume these events were based on race or sex, and were to take them together with the remaining incidents, the Court would find the alleged harassing acts, spread as they were over more than half-a-decade, were neither severe nor pervasive enough to establish a legally cognizable hostile work environment.  In April, 2003, one co-worker made the comment about the Oprah Winfrey show.  Sometime in 2004 or 2005, another co-worker suggested plaintiff's co-workers had difficulty getting along with her because she was black and female.  On unspecified dates plaintiff found adult magazines in her machine.  In 2006, a co-worker repeatedly told her, "Give me my prick."  Through all of this, plaintiff knew of defendant's sexual harassment policy, and had used it successfully in the past, yet did not report any of these incidents to supervisors.

It has been amply shown that when plaintiff did avail herself of the employer's harassment policy, and made defendant aware of a problem, defendant responded appropriately.  By way of example, when in 2005 a co-worker said "I got some balls you can eat," the plaintiff reported it.  As a result, the co-worker was given counseling, and plaintiff reported no further problems.  Another co-worker said, "If I had my way, I'd get rid of all women and minorities"; again, after a simple complaint, the co-worker was counseled and plaintiff reported no further problems.  Finally, in August, 2005, when plaintiff heard a voice over the two-way radio,

17

she reported it.   Upon receiving the report, and despite plaintiff's unwillingness to participate in the investigation, Rock Tenn investigated.   The investigation did not reveal the perpetrator, but it is undisputed that no further incidents occurred.

While these incidents were undoubtedly crass and offensive, they represent isolated incidents to which defendant appropriately responded.   The Court finds, as a matter of law, that based upon these facts, no reasonable jury could find plaintiff was subject to severe or pervasive harassment.

Accordingly, defendant is entitled to summary judgment on plaintiff's claims of a hostile work environment.

C.   <u>State Law Claims</u>

Plaintiff invokes the Court's supplemental jurisdiction to bring claims of negligent and intentional infliction of emotional distress, negligent supervision, and defamation.   Defendant is entitled to summary judgment on these, also.[8]

To establish a claim for negligent infliction of emotional

---

[8]These undifferentiated claims are made in count 5, titled "Negligence," which seems to allege negligent infliction of emotional distress and negligent supervision.   Count 9 alleges intentional infliction of emotional distress and defamation.   The Court is constrained to state that it is very difficult to clearly differentiate multiple claims, when - as here - the complaint inexplicably lacks a count 3, 4, 6, 7 or 8.   Nevertheless, summary judgment is granted as to count 1 (Section 1981), count 2 (Section 1983), the first count 5 (MHRA), the second count 5 (Negligence), and count 9 (Intentional Tort).

18

distress, plaintiff must show she was within the zone of danger of physical impact, reasonably feared for her safety, and suffered severe emotional distress with physical manifestations. Stadler v. Cross, 295 N.W.2d 552, 553 (Minn. 1980). Taking every fact plaintiff alleges as true, the Court finds she has failed to establish any of these elements. She fails, because she has no credible evidence showing she was ever in a zone of physical impact causing her to reasonably fear for her safety. There is no evidence of causation, or of the physical manifestations required for severe emotional distress.[9] Defendant is entitled to summary judgment on this claim.

The same is true for plaintiff's claim of intentional infliction of emotional distress. To establish this claim, plaintiff must show defendant's conduct was extreme and outrageous, as well as intentional or reckless, and it caused severe emotional distress. See Langeslag v. KYMN Inc., 664 N.W.2d 860, 864 (Minn. 2003). The tort is "sharply limited to cases involving particularly egregious facts." Id. (internal quotation omitted).

---

[9]At oral argument, plaintiff's counsel for the first time argued a hostile work environment caused plaintiff's March, 2004, seizure. The complaint contains no such allegation. While plaintiff provided her personal medical records, she offers no expert medical opinion suggesting, let alone establishing, that her workplace experiences caused her seizure. Counsel conceded no medical evidence supported this argument. Accordingly, the Court finds no evidence upon which a reasonable jury could conclude any alleged discrimination or harassment caused plaintiff's physical injuries.

"Extreme and outrageous" conduct is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." Id. at 865. Even taken in the light most favorable to plaintiff, none of defendant's alleged conduct can be so regarded. Defendant is entitled to summary judgment on this claim.

Defendant is also entitled to summary judgment on plaintiff's claim of negligent supervision. Liability for negligent supervision is imposed under a theory of respondeat superior; the employer is liable because the employee committed a tortious act while acting in the scope of employment. See Bruchas v. Preventive Care, Inc., 553 N.W.2d 440, 443 (Minn. Ct. App. 1996). The tort, however, requires some form of physical injury. Id., citing Semrad v. Edina Realty, Inc., 493 N.W.2d 528, 533-34 (Minn. 1992). Plaintiff has entirely failed to identify the employees she claims were negligently supervised, nor does she allege her co-workers' statements were made within the scope of employment. Finally, she fails to allege physical injury or threat of bodily harm. On these facts, there is no evidence to submit to a jury. Summary judgment is granted as to this claim.

Finally, summary judgment is appropriate on plaintiff's defamation claim. A defamatory statement must be false, must be communicated to another, and must tend to harm the plaintiff's reputation. Bol v. Cole, 561 N.W.2d 143, 146 (Minn. 1997). If the

statement is true, it cannot be defamatory.  See Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980).  Even if the statement is defamatory, defendant may not be liable if the statement is protected by a qualified privilege.  Bol, 561 N.W.2d at 149.  The privilege applies if the statement was based upon reasonable or probable cause, and was made in good faith upon a proper occasion, from a proper motive.  Id.  However, the privilege does not protect malicious statements - that is, ones made from "ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff."  See Stuempges, 297 N.W.2d at 257.

Plaintiff has not precisely specified the statements she alleges are defamatory.  The record discloses two statements made about plaintiff to third parties.  The first occurred in 2001, when a co-worker called her a lesbian.  This statement cannot be defamatory; plaintiff acknowledges it is true.  The second occurred in 2005, when Tousley told Wilson plaintiff had lied about being sick.  Even if defamatory, the Court finds this statement protected by a qualified privilege as a matter of law.

Tousley, plaintiff's supervisor, spoke to Wilson, her manager at work, about an incident related to plaintiff's job performance.  This is a proper occasion and proper motive.  Even if the statement was false, the record discloses no evidence showing Tousley spoke in bad faith or with malice.  Similarly, there is no evidence that

the statement tended to injure plaintiff's reputation at work. Therefore, defendant is entitled to summary judgment on this claim.

III.   Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment.

Dated:  November 18, 2008

                              s/ James M. Rosenbaum
                              JAMES M. ROSENBAUM
                              United States District Judge